

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION



KEITH DAVIS WEINER,

      Petitioner,

v.

BARBARA BOCK,

      Respondent.

_____/

CIVIL ACTION
NO. 00-CV-10002-BC

DISTRICT JUDGE DAVID M. LAWSON
MAGISTRATE JUDGE CHARLES BINDER


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
## ON PETITION FOR WRIT OF HABEAS CORPUS


## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that the Petition for Writ

of Habeas Corpus be **DENIED** and the case be **DISMISSED WITH PREJUDICE**.


## II.    REPORT

### A.    Introduction

Pending, pursuant to an Order of Reference from United States District Judge David

Lawson, is Keith Weiner's Petition for Writ of Habeas Corpus. (Dkt. 1.) The petition, which

was filed through counsel on January 3, 2000, presents twelve arguments challenging

Petitioner's 1977 conviction for first-degree felony murder. On June 12, 2003, the petition

was referred to the undersigned Magistrate Judge for an evidentiary hearing. (Dkt. 33.) The hearing was held on September 4, 2003. Subsequent to receipt of the hearing transcript, counsel for both Petitioner and Respondent filed post-hearing briefs. (Dkts. 45 & 49.) Accordingly, the case is ready for Report and Recommendation.

### B.      Factual Background

Petitioner's conviction arose out of the shooting death of Ernest Wallace, who was known as "Lucky," on May 17, 1977, in Detroit, Michigan. Trial was held in Recorder's Court for the City of Detroit in August 1977, where Petitioner was tried jointly with co-defendant Michael Lee Wilson ("Wilson").

At trial, Cynthia Ann White ("White") testified that on the evening of May 17, 1977, she got together with Petitioner, Wilson, and James Frederick Blakey (known as "Candy Man"). White was 16 years old at the time, and she testified that she and Petitioner, who was 27 years old, were dating and spent time together "like every night." (Trial Tr. Vol. III at 98.) That night, while the four of them were in Wilson's car, Petitioner asked White if she remembered a previous conversation they had had about him needing money. She understood him to be referring to his plan to rob, or "rip off," another friend of hers by the name of Kenny. (*Id.* at 72.) That night, Petitioner reiterated his need for money so that he could make his van payment and also so he and White could get a house together. (*Id.*) The four of them rode by Kenny's house, but he was not home. White testified that, "[i]f [Petitioner] couldn't get it from Kenny, he had to get it from somewhere else, because he needed to pay it [sic] for his van payments. He said that he had to have that within a few

2

days, and he needed the money." (*Id.* at 113.) White then told the group that she knew a

man called "Lucky" who owned a record store. She informed them that Lucky sold drugs

out of the back room of his record store, and therefore always had a lot of money around.

(*Id.* at 75.) They devised a plan:

> Well, I was going to give [Lucky] a call and tell him that I would be coming
> over, and he would be expecting me – and he has a buzzer on his door – and
> I would go over there, and "Candy" and Mike [Wilson], they were going to be
> behind [my friend] Michelle and I, waiting a few yards, and Keith [Petitioner]
> was waiting in the van. And I rang the buzzer and "Lucky" was going to open
> the door, and I was going to pretend I tripped on my foot and empty stuff out
> of my purse, and "Lucky" was going to help me up and that was when they
> was going to come in and grab at him.

(*Id.* at 76-77.) They planned to steal both money and drugs, which they would split into four

equal shares. (*Id.* at 85-86.)

White admitted that, of the four occupants of the car, it was mainly she and Petitioner

who developed the plan.[1] (*Id.* at 77.) She also admitted that she was the only one of the four

who knew Lucky prior to this evening, and that she warned the others that Lucky had a gun.

(*Id.* at 83.) White explained on cross-examination why the plan called for Petitioner to

remain in the van while Wilson and Candy Man went in the store with the girls to rob Lucky:

> A.    It was just that, well, [Lucky] wouldn't know who did it. [Petitioner]
>       told me [Lucky] would not know because there would be two black
>       males [Wilson and Candy Man], and there would be no way that he
>       would know that [Petitioner] or I had anything to do with it.

---

[1]On cross-examination, White was confronted with the fact that she had testified at the preliminary
examination that it was her idea to rob Lucky. (*Id.* at 114-15.) She explained that, at that time, she was still
trying to protect Petitioner as much as she could, because of her feelings for him. At trial, however, she
claimed to be telling the truth that it was not just her idea to set Lucky up, but also Petitioner's. (*Id.* at 115-
16.)

3

Q.     Even though you were going to trip in the doorway?

A.     Right.

Q.     And they were going to run in behind you?

A.     Because [Petitioner] told me I was supposed to be at a bar. I was
       supposed to pretend I was drunk from a bar and go over there.

(*Id.* at 116.)

After developing the plan, the four drove to Petitioner's house and White called Lucky

to ask if she and a friend could come over in about an hour. Lucky agreed. White's friend,

Michelle LaForest ("LaForest"), who was at Petitioner's house, joined the group and the five

of them departed in Petitioner's van. Counsel inquired about the decision to take LaForest

along:

Q.     And isn't it a fact that the reason you brought Michelle along on that
       particular date was to help and induce "Lucky" to open up the door that
       late at night?

A.     Well, all four of us – or all three of us, [Petitioner], [Wilson], "Candy"
       and I thought it would be a lot better; it would look better.

Q.     You brought her along to induce "Lucky" because you knew he liked
       young girls, especially young white girls; isn't that correct?

A.     And also the fact because I was scared to do it myself.

Q.     Did you know that this young girl was 14 years old?

A.     Yes, I did at the time.

(*Id.* at 117.)

After leaving Petitioner's house, Petitioner drove them all to Candy Man's house,

where Candy Man retrieved a pair of binoculars, a pellet gun, and a .38 caliber pistol. (*Id.*

4

at 81-82.) White testified that Petitioner and Candy Man put electrical tape on the guns to prevent fingerprints. (*Id.* at 84.) Petitioner promised White that no one was going to get hurt, and that the guns were just going to be used to scare Lucky. (*Id.* at 85.) The group then dropped Candy Man off about one block from Lucky's store. Shortly thereafter, they picked Candy Man back up, and he reported to the group that everything looked perfect. Petitioner then parked his van near Lucky's store. White "sort of briefly" told LaForest what was going to happen and warned her "not to listen too much. Just do what I do. You know, just stay next to me and follow me." (*Id.* at 86.)

White testified that she, LaForest, Candy Man, and Wilson then left the van. The four walked to the record store, but not together. The girls walked in front; the men lagged behind. When Lucky opened the door to admit the two girls, Wilson and Candy Man pushed inside, grabbed Lucky around the throat, and put a gun to his head. Lucky then called out to a woman in the back room, but White never saw the woman. (*Id.* at 88.) White testified that Wilson and Lucky began wrestling. Candy Man then fired two shots in the direction of Wilson and Lucky, and ran from the store. (*Id.* at 89.) White and LaForest both also then fled the store. When they got outside, they saw the van going down the street, leaving them behind. (*Id.* at 92.) White then heard another gunshot, followed by a scream. Moments later, Wilson came out of the store and joined White and LaForest. He told them that Lucky was badly hurt, and explained that "it was either him shooting Lucky or Lucky shooting him." (*Id.* at 93.)

5

White testified that she, LaForest, and Wilson began walking, and Wilson at some point threw his gun into some bushes. (*Id.* at 94.) About an hour later, the three were arrested on a Detroit street corner for loitering. White was the only one carrying any identification, which she gave to LaForest and told her (LaForest) to use it so she wouldn't get in trouble for being out past her curfew. (*Id.* at 95.) White used the name "Jean Ann" when asked by the patrol officer. When White's mother arrived at the station, however, these lies were discovered, and the police learned the girls' true identities.

LaForest also testified at the trial, and her account of the events leading up to the group's arrival at the record store was substantially consistent with White's. LaForest stated that she had no idea a robbery was being planned, because when the other four occupants of the van were talking, all she heard was that they were going to get some cocaine and money. (Trial Tr. Vol. II at 110.) LaForest testified that right before they went into the record store, White said to her, "When I fall, pick up my shoes." (*Id.* at 111.) She stated that "[w]hen we got to the door of the record shop, she fell and then I knew something. So, I bent down, and they came in after." (*Id.*) When asked at what point she first saw the guns, she answered "[w]hen 'Candy Man' . . . put his arm around Lucky's neck and put the gun up to his head."[2] (*Id.* at 113.) LaForest said that she saw a woman look out from the back room when it all started, but then she shut the door. (*Id.* at 116-17.) She also stated she never saw Lucky with a gun, although she did see him reach under a shelf for something, but that's when she and White ran out. (*Id.* at 116.)

---

[2]LaForest's testimony on this point was contrary to White's statement that LaForest saw the guns while they were all still in the van. (Trial Tr. Vol. II at 111.)

The following morning, both girls gave statements to the police implicating Petitioner, Wilson, and Candy Man in the robbery and shooting. White testified that she was told by the officers that anything she said would not be used against her so long as she was willing to cooperate to the fullest extent. (*Id.* at 144.) White acknowledged on cross-examination, however, that the first version of events she relayed to the police was not entirely truthful because she was trying to protect Petitioner as much as possible by minimizing his involvement. (*Id.* at 137.) LaForest also testified that she gave an untruthful statement at first to the police because she was scared and trying to protect herself and her friends. (*Id.* at 31; Vol. II at 123.) Later that day, both girls accompanied two detectives to the location where they had seen Wilson throw the gun, but it was never found. (Vol. III at 18, 128.)

Based upon the information received from White and LaForest, Petitioner was arrested at his home at 11:30 that morning. Police Sergeant Thomas Rossler testified[3] that a few hours after Petitioner's arrest, Rossler advised Petitioner of his constitutional rights by reading aloud to him the Detroit Police Department's Constitutional Rights Certificate of Notification form. (Trial Tr. Vol. IV at 77-78.) Petitioner indicated that he understood his rights, and he signed the form. (*Id.* at 78.) Sergeant Rossler testified that after he advised Petitioner of his constitutional rights and informed Petitioner that he was being charged with felony murder, they had a conversation during which Petitioner made statements that incriminated himself in the armed robbery. (*Id.* at 79.)

---

[3]Much of Sergeant Rossler's testimony is taken from the *Walker* hearing which took place on the fourth day of trial.

7

When asked if he made any threats or promises to Petitioner, Sergeant Rossler acknowledged that after Petitioner indicated that he knew about the crime, Rossler told Petitioner that if he was cooperative and told him everything, Rossler would see if he could speak to the prosecutor's office and the judge about any sentences or pleas that might be extended to him. Petitioner cooperated, gave a statement which was reduced to writing, and the writing was presented to him to read. Petitioner read it and signed it. The statement was read to the jury at trial. (*Id.* at 80-83.) In the statement, Petitioner admitted that the group went to the record store with the intention of robbing Lucky, and that before arriving at the record store, Petitioner drove the group to Candy Man's house to retrieve two guns. Petitioner also stated that while the group was planning the robbery, he clearly informed the others that he did not want any part of anyone getting hurt or shot. In response, he was promised that the guns would only be used to scare Wallace. (*Id.* at 82.)

Petitioner did not testify in his own defense at trial, nor did he put on any witnesses. His co-defendant, Michael Wilson, took the stand and testified that the group was just riding around that night getting something to eat, when Cynthia White said she wanted to get some money and cocaine from a guy named Lucky who owned a record store. (Trial Tr. Vol. V at 16.) She asked Petitioner if he could "help her do it," and he said yes. (*Id.*) Wilson stated that hey all smoked a few joints of marijuana while Candy Man went in his house and changed his clothes. (*Id.* at 17-18.) When Candy Man got back in the car, he was carrying a leather handbag. Wilson testified that White said they were going to go to Lucky's now, and she said she had dealt with him in the past and he "gave her just about anything she

8

asked for." (*Id.* at 18.)  When they arrived at the record store, Wilson testified that the following occurred:

> A.   . . . And so, Keith [Petitioner] said there wasn't no parking space near the shop, so he was going to park around the corner.
>
> So, we went – we took a left on the street, after the shop, and Keith [Petitioner] parked about middle ways the block [sic], near the next corner, off of Joy Road.  And Cindy [White] and Michelle [LaForest] and "Candy" attempted to get out of the van and say, "Well, come on. Let's go."  I said, "what you want me to do?  Walk you near the next corner?"
>
> Q.   Now, let me interrupt you for a second.  Did anybody discuss in any way at this time, any robbery?
>
> A.   Briefly, she flirted and said, "Lucky" had a lot of money, and stuff.  She could have said, "Well, because he trusted her."
>
> Q.   And this came out during the conversation?
>
> A.   Right.
>
> Q.   Okay.  Were any weapons produced at any time?
>
> A.   Well, "Candyman" had pulled out an old toy gun and Cindy [White] played with it.  It was a pellet gun.  I looked at it and lied [sic] it on the floor of the van.
>
> Q.   Did you [see] pistols that you thought were actually pistols?
>
> A.   I can't say I did, because I was sitting in the back of the van.  And Cindy was in "Candy's" lap.

(*Id.* at 20-21.)  Wilson stated that he then walked with the girls and Candy Man to the record store, but never went in.  Wilson also stated that he had no idea what was going on until he heard a gun shot, and the girls ran back out "in hysterics" and told him that Candy Man had robbed Lucky and fired some shots.  (*Id.* at 21-23.)

9

At the conclusion of the five-day trial, the jury found both Petitioner and Michael Wilson guilty of first-degree felony murder. Petitioner was sentenced to the mandatory term of life in prison without the possibility of parole.

### C.    Post-Conviction Procedural History

In September 1978, attorney Theodore P. Panaretos filed an appeal brief with the Michigan Court of Appeals on behalf of Petitioner, raising the following four claims:

I.    Were the actions of the police officer in advising Defendant-Appellant as an attorney in order to obtain a confession and denying him legal counsel improper?

II.   Was the police officer's offer of a sentence consideration wherein he knew none was possible in view of the charges of which the defendant could be found guilty improper?

III.  Was the court's treatment of defense counsel belittling and unduly prejudicial to the cause of defendant-appellant?

IV.   Were the court's instructions to the jury wherein attention was called to one portion of the statute improper?

(Rule 5 Mat., Br. on Appeal dated Sept. 5, 1978.) Prior to a decision by the appeals court, Plaintiff retained new appellate counsel, attorney Carl Ziemba, who sought leave to file a supplemental brief. Leave was granted, and the following five claims were presented:

I.    Whether defendant was deprived of his right under the [United States and Michigan constitutions] to due process and a fair trial when the trial court in supplemental instructions to the jury gave a completely erroneous definition of murder of the first degree and of murder of the second degree and omitted to define essential elements of both offenses.

II.   Whether defendant was deprived of his right under the [United States and Michigan constitutions] to due process and a fair trial when the trial judge abused his discretion in ruling that the prosecution had shown

10

due diligence in efforts to produce on trial a <u>res gestae</u> witness whose name had been indorsed on the information and when the prosecution failed to produce such witness on trial.

III. Whether defendant was deprived of his right under [the United States and Michigan constitutions] to due process and a fair trial when the trial judge gave the jury an inadequate instruction on the law of aiding and abetting and the only basis upon which the defendant could be convicted of first degree murder was that he aided and abetted the principal.

IV. Whether defendant was deprived of his right under [the United States and Michigan constitutions] to effective assistance of counsel when his trial counsel (1) failed to object to erroneous instructions by the trial court, (2) failed to request fuller instruction on aiding and abetting, (3) failed to move for dismissal of charges when the prosecutor failed to produce an indorsed <u>res gestae</u> witness, and (4) failed to seek the suppression of defendant's confession on proper grounds.

V. Whether defendant was deprived of his right to due process and a fair trial under the 14th Amendment . . . when the prosecution failed to carry its burden of proving that defendant's confession was voluntarily given.

(Rule 5 Mat., Supp. Br. on Appeal dated Feb. 27, 1979.)

In September 1979, the Michigan Court of Appeals reversed Petitioner's conviction based upon a finding that, although the trial court's original jury instructions were correct, the court omitted the element of malice when giving supplemental instructions in answer to a jury question raised during deliberations. (Rule 5 Mat., *People v. Weiner*, No. 77-4885 (Mich. Ct. App. Sept. 7, 1979).) One judge dissented, noting that the Court of Appeals' panels at that time were divided on whether the crime of felony murder in Michigan included a separate element of malice. (*Id.*)

The State appealed the reversal of the conviction to the Michigan Supreme Court, arguing that the supplemental jury instructions were proper. On April 3, 1980, the court

11

ordered the case held in abeyance pending its decision in several other cases then under review which also raised questions regarding the element of malice in felony murder cases. In November 1980, the Michigan Supreme Court handed down its pronouncement on the law of felony murder in Michigan. *People v. Aaron*, 409 Mich. 672, 733, 299 N.W.2d 304 (1980). In August 1985, the Michigan Supreme Court reversed the judgment of the Michigan Court of Appeals in Petitioner's case, reinstated his conviction for first-degree felony murder on the basis of *Aaron, supra*, and remanded the case to the Court of Appeals for consideration of the other issues raised on appeal that had not been addressed. (Rule 5 Mat., *People v. Weiner*, No. 63860 (Mich. Aug. 28, 1985).)

On October 8, 1985, attorney Philip Sielski filed on Petitioner's behalf a motion for reconsideration to the Michigan Supreme Court. The motion for reconsideration was denied on March 26, 1986. (Rule 5 Mat., *People v. Weiner*, No. 63860 (Mich. March 26, 1986).)

On remand, the Michigan Court of Appeals affirmed Petitioner's conviction in a six-page per curiam opinion. (Rule 5 Mat., *People v. Weiner*, No. 87268 (Mich. Ct. App. June 4, 1986).)

On June 23, 1986, Petitioner filed through counsel Sielski a motion for rehearing with the Court of Appeals, seeking a rehearing of the decisions of both September 7, 1979, and June 4, 1986. The motion for rehearing was summarily denied. (*People v. Weiner*, No. 87268 (Mich. Ct. App. July 29, 1986).)

In August 1986, Petitioner appealed the denial of the motion for rehearing to the Michigan Supreme Court. (Dkt. 29, Br. dated August 21, 1986, at 8.) The Michigan

12

Supreme Court denied Petitioner's application for leave to appeal. (Rule 5 Mat., *People v. Weiner*, No. 79289 (Mich. Dec. 3, 1986).)

Eleven years later, in April 1997, Petitioner filed a motion for relief from judgment. The trial court denied the motion, finding that Petitioner had procedurally defaulted all of the claims he sought to raise, and that he had not shown "good cause for failure to raise such grounds on appeal" and "prejudice from the alleged irregularities that support the claim for relief" as required by Michigan Court Rule 6.508(D)(3). (Rule 5 Mat., *People v. Weiner*, No. 77-03866 (Detroit Recorder's Ct., August 22, 1997).)  Petitioner filed a motion for reconsideration in September 1997, which was denied in January 1998.

Petitioner then filed through counsel Russell Rhynard a delayed application for leave to appeal the denial of the motion for relief from judgment with the Michigan Court of Appeals, asserting the same seven claims that were found procedurally defaulted by the trial court:

I.      Appellant is entitled to relief from judgment because appellant's constitutional right to a fair trial under . . . the Michigan Constitution and Ams. V, VI, [and] XIV of the federal Constitution was violated when the state failed to provide the jury with sufficient evidence for them to find the appellant guilty of first-degree murder, thereby requiring a directed verdict of acquittal.

II.     Appellant is entitled to relief from judgment because appellant's constitutional right to a fair trial under . . . the Michigan Constitution and Ams. VI & XIV of the federal Constitution was violated when the trial court, during its main instructions on malice, provided the jury with both correct and incorrect instructions on malice, thus depriving the jury of essential instructions necessary to determine appellant's guilt or innocence.

13

III.    Appellant is entitled to relief from judgment because appellant's constitutional right to a fair trial under . . . the Michigan Constitution and Ams. V, VI, [and] XIV of the federal Constitution, because he was denied due process when the supplemental jury instructions relieved the prosecution of proving an essential element of first degree murder – felony murder.

IV.     Appellant is entitled to relief from judgment because the appellant was denied his due process right to a fair trial under . . . the Michigan Constitution and Ams. VI & XIV of the federal constitution, when the trial court instructed the jury they could find the appellant guilty of felony-murder if they found the death occurred during the course of a robbery or an attempted robbery; but failed to provide the definition of "attempt."

V.      Appellant's rights to due process of law and a fair trial under both state and federal constitutions were denied when his trial counsel denied him his right to effective representation during his trial by:

        A.      Failing to move for a directed verdict after the evidence presented by the state failed to establish, beyond reasonable doubt, sufficient support to establish the charge of first-degree murder;

        B.      Failing to object to the erroneous <u>main</u> jury instruction on the element of malice;

        C.      Failing to object to the trial court's <u>supplemental</u> jury instruction which relieved the prosecution of its duty of proving, beyond a reasonable doubt, each essential element of first-degree murder;

        D.      Failing to object to the trial court's failure to provide an appropriate instruction on the definition for "attempt."

VI.     Appellant's rights to due process of law and a fair trial under both state and federal constitutions were denied when his appellate counsel denied him of his right to effective representation during his appeal of right when:

                He failed to raise arguments I thru IV on appellant's appeal of right.  If required, cause and prejudice has been established for this court to now review these issues in defendant's motion for

14

•

ˏ

> relief from judgment, thus allowing this court to grant him a
> directed verdict of acquittal, or, a vacating of his judgment of
> conviction and a granting of a new trial.

VII.   The cumulative effect of errors, although in and of themselves are
sometimes considered harmless and insufficient to warrant relief,
violated appellant's constitutional right of due process to a fair trial
under both state and federal constitutions.

(Rule 5 Mat., Delayed Appl. for Lv. to Appeal dated Aug. 7, 1998.)

The Michigan Court of Appeals denied leave to appeal "for failure to meet the burden

of establishing entitlement to relief under MCR 6.508(D)." (Rule 5 Mat., *People v. Weiner*,

No. 213809 (Mich. Ct. App. Dec. 11, 1998).)

Petitioner appealed to the Michigan Supreme Court. That court likewise denied leave

to appeal "because the defendant has failed to meet the burden of establishing entitlement

to relief under MCR 6.508(D)." (Rule 5 Mat., *People v. Weiner*, No. 113960 (Mich. Aug.

31, 1999).)

On January 3, 2000, Petitioner filed through counsel his Petition for Writ of Habeas

Corpus with this Court, presenting the following claims for relief:

I.   The prosecution failed, in light of the facts adduced at the <u>Walker</u>
evidentiary hearing, and their application to <u>Miranda v Arizona</u>, to
carry its burden of proving that Petitioner's confession was voluntarily
given, thereby depriving Petitioner of his rights to due process of the
law and a fair trial as provided by the Fifth and Fourteenth
Amendments of the United States Constitution, and Art. 1, § 17 of the
Michigan Constitution, 1963. The hearing also revealed Petitioner was
deprived of his right under the Sixth Amendment of the United States
Constitution, and Art. 1, § 20 of the Michigan Constitution, 1963, to
have the presence of an attorney during pre-arraignment interrogation.

II.   Petitioner is entitled to relief from judgment because Petitioner's
constitutional right to a fair trial under . . . the Michigan Constitution

and Ams. V & XIV of the federal Constitution, was violated when the
state failed to provide the jury with sufficient evidence for them to find
the petitioner guilty of first-degree murder, thereby requiring a directed
verdict of acquittal.

III.    Petitioner is entitled to relief from judgment because Petitioner's
constitutional right to a fair trial under . . . the Michigan Constitution
and Ams. V & XIV of the federal Constitution was violated when the
trial court, during its main instructions on malice, provided the jury
with both correct and incorrect instructions on malice, thus depriving
the jury of essential instructions necessary to determine Petitioner's
guilt or innocence.

IV.     Petitioner is entitled to relief from judgment because Petitioner's
constitutional right to a fair trial under . . . the Michigan Constitution
and Ams. V & XIV of the federal Constitution were violated when he
was denied due process when the supplemental jury instructions
relieved the prosecution of proving an essential element of first degree
murder – felony murder.

V.      Petitioner is entitled to relief from judgment because the Petitioner was
denied his due process right to a fair trial under . . . the Michigan
Constitution and Ams. V & XIV of the federal Constitution when the
trial court instructed the jury they could find the appellant guilty of
felony-murder if they found the death occurred during the course of a
robbery or an attempted robbery, but failed to provide the definition of
"attempt."

VI.     Petitioner's confession was improperly obtained when the interrogating
officer, after being advised by Petitioner that he wanted an attorney
during the interrogation, said he would talk to Petitioner as an attorney,
which he did to obtain a confession. Said actions deprived Petitioner
of his right to legal counsel during the interrogation process. Such
treatment resulted in tricking Petitioner into being a witness against
himself during trial. Said actions are contrary to the Fifth, Sixth and
Fourteenth Amendments of the United States Constitution, and Art. 1,
§ 17 & 20 of the Michigan Constitution, 1963.

VII.    Petitioner was deprived of his right to confrontation when the trial court
erroneously ruled and the Michigan Court of Appeals erroneously
affirmed that the prosecution had shown due diligence in its efforts to

16

produce at trial an on-the-scene <u>res gestae</u> witness, whose name was indorsed on the information, but was not produced at trial.

VIII. The trial court's failure to provide the jury with complete and adequate instructions on the law of aiding and abetting, deprived Petitioner of his right to due process of law and a fair trial, contrary to the Fifth and Fourteenth Amendments of the United States Constitution and . . . the Michigan Constitution.

IX. The Michigan Supreme Court improperly reversed a judgment of the Michigan Court of Appeals which clearly reversed a judgment of conviction based on erroneous and inadequate <u>supplemental</u> jury instructions regarding the definition of first-degree and second-degree murder, which failed to mention essential elements of both offenses, thus depriving Petitioner of his constitutional right to due process of law and a fair trial, contrary to the Fifth and Fourteenth Amendments of the United States Constitution and . . . the Michigan Constitution.

X. Petitioner's right to due process of law and a fair trial under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution and . . . the Michigan Constitution . . . were denied when his trial counsel failed to provide effective representation during his trial in the following manner, by:

    A. Failing to seek suppression of Petitioner's confession based [on] all grounds available, e.g., failure to cease interrogation after Petitioner requested counsel; when the interrogator's passed themselves off as counsel; no written motion seeking suppression of the confession was filed; and failing to protect his client's best interest when counsel turned against his client during the <u>Walker</u> hearing;

    B. Failing to move for a directed verdict after the evidence presented by the state failed to establish, beyond reasonable doubt, the charge of first-degree felony-murder;

    C. Failing to object to the erroneous <u>main</u> jury instruction on the element of malice;

    D. Failing to object to the trial court's <u>supplemental</u> jury instruction which relieved the prosecution of its duty of proving, beyond a

>
> reasonable doubt, each essential element of first-degree murder, primarily the element of "malice";
>
> E. Failing to object to the trial court's failure to provide an appropriate instruction on the definition for "attempt";
>
> F. Failing to move the court for a dismissal of charges when the prosecutor failed to produce an endorsed res gestae witness;
>
> G. Failing to object to the trial court's encouragement to follow the prosecution's incomplete and misdescribed aiding and abetting instruction for felony murder provided by the state, and for failing to object to the trial court's providing incomplete and misdescribed aiding and abetting instructions for a felony murder, and for failing to request a complete and adequate jury charge for aiding and abetting a felony murder;
>
> H. Failing to properly determine if probable cause existed to arrest the defendant.

XI. Petitioner's state and federal constitutional rights were violated when appellate counsel failed to provide effective representation during Petitioner's appeal of right. Appellate counsel failed to discern serious constitutional issues which affected the truthfinding process. He also failed to inform the court of appeals of new rulings handed down by the Michigan Supreme Court and the U.S. Supreme Court, which would have had a direct affect on the outcome of Petitioner's appeal of right. Literally, appellate counsel abandoned his client in the middle of his appeal of right because his client's family could not pay the legal fees as agreed upon.     These violations deprived Petitioner of his constitutional rights under the Fifth Sixth and Fourteenth Amendments of the United States Constitution and . . . the Michigan Constitution.

XII. The cumulative effect of errors, although in and of themselves may be considered harmless and insufficient to warrant relief, violated Petitioner's constitutional right of due process to a fair trial under both state and federal constitutions.

(Pet., Dkt. 1 at i-iv.)

On March 9, 2000, Respondent filed a motion to dismiss the habeas petition for failure to comply with the applicable statute of limitations. On July 15, 2002, Judge Lawson held that, although the petition was filed after the expiration of the statute of limitations, it could be saved by applying the doctrine of equitable tolling. (Dkt. 18.) Further, the Court held that Respondent, as represented by the Michigan Attorney General, had forfeited the right to contest the merits of the petition by filing a motion to dismiss solely on statute of limitations grounds, rather than arguing that issue in addition to responding to the merits of Petitioner's twelve grounds for habeas relief. (*Id.*) Respondent promptly filed a motion for reconsideration. (Dkt. 19.)

Four months later, on November 27, 2002, Petitioner filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, asserting that he is entitled to habeas relief on the basis of the claim that the police violated the rule announced in *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), (which he claimed was to be retroactively applied to his case), when they did not cease questioning him after he asked for an attorney. (Dkt. 26.)

On December 23, 2002, Judge Lawson directed Respondent to respond to the motion for summary judgment and denied Respondent's still-pending motion for reconsideration as moot "since the response will presumably address the merits of the petition . . . ." (Dkt. 28 at 2.) The response to the motion for summary judgment was filed on January 13, 2003, and addressed only the *Edwards* claim, as that was the sole issue raised in the motion. (Dkt. 30.) Respondent argued that (1) the *Edwards* rule, which provides that "[a] suspect who invokes

19

the *Miranda* right to counsel may not be reapproached by police unless counsel is made available," *U.S. v. Harris*, 221 F.3d 1048, 1051 (8th Cir. 2000)[4], is not applicable to this case because Petitioner Weiner was never *reapproached* by police – there was one continuous custodial interrogation lasting approximately one hour; (2) Petitioner's real claim, that his right to counsel under *Miranda*[5] was violated when he asked for an attorney and the interrogating officers failed to stop questioning him immediately, is barred from habeas review because it was never brought before the Michigan Court of Appeals in any form except Petitioner's 1986 motion for rehearing; (3) the Michigan Court of Appeals stated that Petitioner's Sixth Amendment right to counsel was not violated; and (4) the trial court heard Petitioner's self-serving testimony at the *Walker* hearing and explicitly found it to be incredible. (Dkt. 30 at 6-8.)

On June 12, 2003, Judge Lawson granted Petitioner's request for an evidentiary hearing on his *Edwards* claim. (Dkt. 33 at 1.) The Court noted that the trial court's findings at the conclusion of the *Walker* hearing did not include a factual determination as to the specific question of whether Petitioner invoked his right to counsel. (*Id.* at 9.) Further, the Court found that *Edwards* does retroactively apply to Petitioner's case because *Edwards* was decided while Petitioner's appeal was pending in the state courts. (*Id.* at 13.) The Court also noted that the state court's finding that no Sixth Amendment violation occurred was not an

---

[4] *See also U.S. v. Whaley*, 13 F.3d 963, 966 (6th Cir. 1994), stating that pursuant to *Edwards*, "police cannot reinterrogate a suspect who does not initiate a discussion of his offense."

[5] In 1966, the Supreme Court set forth the bright line rule that, when an individual is being subjected to custodial interrogation, "[i]f the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

adjudication of Petitioner's claims regarding his confession, because *Edwards* and *Miranda* are rooted in the Fifth, not the Sixth, Amendment. The Court did not, however, discuss Respondent's assertion of procedural bar. Instead, it concluded that because "[t]he impact of the *Edwards* decision on the petitioner's claims has not been addressed by the state courts," the matter would be referred to the undersigned Magistrate Judge for hearing. (*Id.* at 12.) The Court subsequently denied Petitioner's motion for summary judgment on the grounds that material facts remained in dispute which would be addressed at the evidentiary hearing. (Dkt. 36.)

### D.      Law and Analysis

### 1.      Standard of Review & Governing Law

Petitioner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 1519, 146 L. Ed. 2d 389 (2000). A state court decision involves an

"unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or if the state court either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 1520. The state court decision, however, need not cite Supreme Court precedent, or even reflect awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) (per curiam).

This standard of review is applied when a federal court reaches the merits of a habeas petition's claims. However, there are procedural hurdles that must be overcome before a federal court can reach the merits of a claim. As a general rule, a state prisoner seeking federal habeas relief must have first exhausted his available state court remedies. *Hannah v. Conley*, 49 F.3d 1193, 1195 (6th Cir. 1995); 28 U.S.C. § 2254(b)(1)(A) (a writ of habeas corpus "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State"). There are two methods by which the exhaustion requirement may be satisfied. First, a petitioner may "actually" exhaust a claim by providing the state courts with an opportunity to review the legal contention and underlying facts in a procedurally appropriate manner, or second, he may "technically" exhaust his claim by showing either that a state court has already found his claims defaulted because he failed to follow proper procedures or, if he never fairly presented his claims in any state forum, that no state remedies remained available to him at the time he filed his

federal habeas petition. *See Engle v. Isaac*, 456 U.S. 107, 125 n.28, 102 S. Ct. 1558, 71 L. Ed. 2d 783 (1982). In the latter case, the claim is procedurally barred and may only be reviewed by a federal habeas court if the petitioner can demonstrate cause and prejudice to excuse the failure to present the claim in the state courts. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

### 2. Petitioner's First Habeas Claim: Confession was Coerced and Contrary to *Miranda*

Petitioner's first claim in his habeas petition is that his "confession was coerced and contrary to *Miranda v. Arizona*." (Pet., Dkt. 1 at 10.) Petitioner claims that at the *Walker* hearing, he testified that "after police read him his constitutional rights, he requested an attorney, repeatedly, but never got one." (*Id.*) Counsel for Petitioner argues that "the moment Petitioner requested counsel during interrogation, it was mandatory for all interrogation to cease. This did not occur." (*Id.*) He states that the trial court's failure to follow the clear rule of *Miranda* deprived Petitioner of counsel during interrogation, and also deprived Petitioner of a fair trial because the jury was able to hear the unconstitutionally-obtained confession. Counsel further states that Petitioner testified at the *Walker* hearing that he was threatened by police that if he did not sign the prepared statement, he would be charged with first degree murder. Therefore, counsel argues that the prosecution failed to carry its burden of proving that the confession was voluntarily given.

Petitioner's brief in support of his petition reiterates the assertion that Petitioner's confession was improperly compelled and induced by the threats, promises, and the unsolicited legal advice of Sergeants Rossler and Ridling. (Br. in Supp. at 32-34.) The brief

23

also adds the argument that the Supreme Court's holding in *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), mandates issuance of the writ of habeas corpus. (Br. in Supp. at 30.) In *Edwards*, a criminal appeal from the state courts of Arizona, the defendant argued that his confession should have been suppressed because his *Miranda* rights were violated by police officers when, one day after the officers properly stopped an interrogation when the defendant requested counsel, they returned to the defendant, re-read him his *Miranda* rights, and obtained a confession.

The *Edwards* court began by noting that *Miranda*, which was decided fifteen years earlier, "declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation," and held that when an accused who is being subjected to custodial interrogation requests counsel, "'the interrogation must cease until an attorney is present.'" *Edwards*, 451 U.S. at 482 (quoting *Miranda*, 384 U.S. at 474). The *Edwards* court went on to find that the Arizona courts had improperly held that Edwards' confession was admissible based on the legal finding that it was voluntarily given, in other words, because it was knowing and intelligent and the defendant's will had not been overborne. *Id.* at 483. The Court explained that, although it is true that a confession must have been voluntary to be admissible, voluntariness was not the issue. Instead, the issue raised by Edwards was that once he properly invoked his right to counsel, the police violated the holding of *Miranda* when they reinitiated contact with him the next day without first providing him with an attorney, which caused his waiver of his right to counsel given on the second day to be invalid. *Id.* at 483-84. The Supreme Court agreed. Finding a violation of

24

Edwards' Fifth and Fourteenth Amendment rights established by *Miranda*, the Court held

that

> when an accused has invoked his right to have counsel present during custodial
> interrogation, a valid waiver of that right cannot be established by showing
> only that he responded to further police-initiated custodial interrogation even
> if he has been advised of his rights. We further hold that an accused, such as
> Edwards, having expressed his desire to deal with the police only through
> counsel, is not subject to further interrogation by the authorities until counsel
> has been made available to him, unless the accused himself initiates further
> communication, exchanges, or conversations with the police.

*Id.* at 484-85.

This detailed account of *Edwards* is necessary here, because Petitioner's counsel has

committed the same misstep as the Arizona courts: interweaving the two distinct issues and

presenting them as one. Those two issues are: (1) the claim that the confession was

improperly coerced by threats and promises and therefore should have been suppressed as

involuntary; and (2) that the confession should have been suppressed pursuant to *Miranda*

because, after police read Petitioner his constitutional rights and secured his signature on the

form, Petitioner requested an attorney and therefore under *Miranda* the interrogation should

have immediately ceased.[6] The comingling of these two claims has even generated the

necessity on the part of Petitioner's counsel to, at times, broadly refer to this claim as "the

issue of the unconstitutionality of the confession." (Dkt. 32 at 1.) In the context of habeas

corpus review, the issues and the legal bases upon which they are brought must be defined

---

[6] I note that the Supreme Court recently confirmed the separate nature of these two inquiries, stating
that, for a custodial confession to be admissible, "[t]he prosecution bears the burden of proving, at least by
a preponderance of the evidence, the *Miranda* waiver, *Colorado v. Connelly*, 479 U.S. 157, 169, 107 S. Ct.
515, 93 L. Ed. 2d 473 (1986), and the voluntariness of the confession, *Lego v. Twomey*, 404 U.S. 477, 489,
92 S. Ct. 619, 30 L. Ed. 2d 618 (1972)." *Missouri v. Seibert*, ___U.S.___, 124 S. Ct. 2601, 2608 n.1 (2004).

more discretely so that the appropriate doctrines, such as exhaustion, can be applied to each claim.

Accordingly, I find that these "confession issues" cannot be analyzed as a package, but must be separated in order to determine the state court history of each claim and apply the appropriate review.

### a.    The Claim that the Confession was Involuntary

This claim was first raised during trial. When the prosecutor indicated that she would be introducing Petitioner's statement into evidence, defense counsel objected on the grounds that the inculpatory statement, i.e. confession, was improperly induced by threats and illusory promises of leniency, and therefore involuntary. Specifically, counsel for Petitioner argued that Homicide Sergeant Thomas Rossler tricked or induced Petitioner into confessing by promising that he would talk to the judge and/or prosecutor about a lighter sentence, when Rossler knew full well that the mandatory sentence for felony murder was life in prison, and therefore knew that his promise was meaningless. The trial court thus held what is known in Michigan as a *Walker* hearing, which is conducted out of the presence of the jury. *See People v. Walker*, 374 Mich. 331, 132 N.W.2d 87 (1965). Under Michigan law, the sole purpose of a *Walker* hearing is to determine the fact of voluntariness of a confession. *People v. Shelson*, 150 Mich. App. 718, 724; 389 N.W.2d 159 (1986).

### i.    Trial Court *Walker* Hearing

Sergeant Rossler testified at the *Walker* hearing that, before talking to Petitioner, he advised Petitioner of his constitutional rights, Petitioner signed the waiver of rights form, and

26

indicated that he wanted to cooperate. (Trial Tr. Vol. IV at 5-12.) The time and date were

noted on the form as 1:40 p.m. on May 18, 1977. (*Id.* at 5.) Another homicide sergeant,

Richard Ridling, who was also working on the case, was present.

Sergeant Rossler testified that they explained to Petitioner that he was being charged

with felony murder, and that "anyone involved in a crime was as guilty as the other

participants in the crime; that if he went to Court on it, and was found guilty he could be

sentenced to life in prison." (*Id.* at 6, 10.) When asked whether he made any promises to

Petitioner, Sergeant Rossler stated that, after Petitioner indicated that he wanted to make a

statement, Rossler told Petitioner he would speak to the judge if it went to court and tell the

judge that Petitioner had cooperated with the investigation. (*Id.* at 7, 10). Rossler also

testified that he

> told Mr. Weiner at the time, I wasn't a god; that I could not foresee what all
> the possibilities could happen; but I would try and [assert] my influence upon
> the Prosecutor and the Judge to get a lesser sentence, and I did.

(*Id.* at 20.)

Petitioner also testified at the *Walker* hearing. He stated that he was arrested at his

home at 11:30 a.m., and had not gotten any sleep the night before. (*Id.* at 23.) He further

testified as follows with regard to the interrogation:

> Well, first of all, I didn't encounter Sergeant Rossler. It was Sergeant Ridling.
> And he asked me if I wanted to make a statement and I told him no. And he
> kept asking me and asking me and asking me and I said, you know, "No. I
> don't want to make a statement."
>
> So, Sergeant Rossler comes in the room and then he asks me, "Well, I want to
> talk to you as an attorney and I think that you should make a statement." And
> I says, "You know, I don't want to make a statement." And he goes, "Well,

we're going to take you down back on the 9th floor and if you don't make a statement, we're going to charge you with Murder One." And I says, "I didn't do anything." He says, "We're going to charge you for Murder One and we're going to go with some people over to this place where the crime was committed."

And so, they kept pressuring me and made me sign these statements.

But, as far as running and telling him that all the things that are on that statement, are not true.

(*Id.* at 24-25.) Petitioner estimated that the amount of time he spent with Sergeant Ridling before Sergeant Rossler came in was about 10 minutes. (*Id.* at 26.)

Petitioner also testified that the officers threatened him physically:

Q.   Did the police threaten you in any way?

A.   Well, sir, the only way they threatened me is by saying that if I didn't sign it, I was going to be in a lot of trouble. They would like to kick my ass, because of the young girls and –

Q.   You didn't believe they meant it. They just –

A.   I don't know what to believe, sir.

Q.   Fooling around with the young girls?

A.   There's, you know, a couple of big officers hanging around me, and I'm being charged with Murder One felony and, you know, they're putting the pressure on me, they're really trying to, you know, – to me, I think they're going to do something to me. You know, who's to say that they didn't.

Q.   What did they promise you, if anything?

A.   They promised I would not be charged for no Murder One felony.

(*Id.* at 26-27.)

The court then engaged in a discussion with the lawyers about issues such as what other witnesses might be called for the *Walker* hearing and whether the statement could properly be redacted to protect the rights of the co-defendant. Eventually, the prosecutor began the cross-examination of Petitioner. Petitioner acknowledged that he had completed two years of college, that he was read his rights, that he understood his rights, and that he signed the card. (*Id.* at 39-40.) The following colloquy then took place:

Q.    You knew you didn't have to say anything if you didn't want to?

A.    Yes, ma'am, that's right.

Q.    You knew you had the right to an attorney before you did say anything?

A.    I asked for an attorney.

Q.    Did you ask for an attorney?

A.    Yes, ma'am.

Q.    Okay. And someone refused you an attorney?

A.    I didn't get one.

Q.    Did you sign the statement? You've seen the statement, right?

A.    Yes, ma'am.

Q.    Did you sign that?

A.    Yes, ma'am.

Q.    Is it your signature?

A.    Yes, ma'am.

Q.    All right. And you have been through a criminal trial on two prior occasions, and you have done time on two prior occasions?

29

A.    Yes, ma'am.

(*Id.* at 40-41.)   The prosecutor did not follow up on Petitioner's statement that he had

requested an attorney, nor did defense counsel.

The judge made the following findings:

I listened to this testimony quite carefully because of its extreme importance. The testimony of Sergeant Rossler seems to be frank, open, honest, and he doesn't feel anything.  He even comes – I say it comes closest to a frank statement by a Homicide Officer than I ever heard before, and I agree with him on that.

Now, for the defendant's story, this doesn't ring true. It doesn't ring true at all.

When he starts equivocating and when he indicates that he signed this without knowing what it meant, because he was told that the Officer would talk to the judge, I'm sorry, he can't convince me. I've had enough experience in the past to know just how far he can accept the officer's word and how far he can't. He was trying to make the best deal for himself, or he was just telling the honest truth. He made the statement.

Now, he brings in the girls and tried to tell us what they told him and then it develops that he couldn't have been – he couldn't – get the information from them.

Now, how the officers would have a statement setting forth all of these details without having received it from the defendant himself in this case, the – alludes me completely.

It's my finding that the statement made by the defendant in this case was freely, voluntarily and understandably made by a man who had previous experience with the law, and knew, what his rights were even before he was given them and advised of them.

Therefore, I will rule that the confession may be received with deletions, however, as the name of the person on trial here except the defendant Weiner himself.

(*Id.* at 47-48.)

Following the court's ruling, Sergeant Ridling was located and the *Walker* hearing

was reopened to receive his testimony. Ridling confirmed that he talked to Petitioner for

some time before getting his statement. (*Id.* at 60.) He stated that he told Petitioner things

like, "Be truthful, honest, clear your conscience." (*Id.*)  Contrary to Sergeant Rossler's

testimony, Ridling did not remember anyone ever promising to talk to a judge if Petitioner

cooperated. (*Id.*)

The court found that Sergeant Ridling's testimony did not alter the prior ruling that

Petitioner's statement was freely, voluntarily, and understandably made, and therefore the

redacted statement was admitted. (*Id.* at 66.)

### ii.    Direct Appeal

Petitioner's appellate counsel raised the issue of voluntariness on direct appeal. When

the Michigan Court of Appeals issued its decision in September 1979 reversing Petitioner's

conviction based upon its finding that the trial court had given erroneous supplemental jury

instructions, it also addressed this issue, stating:

> One other issue raised on appeal compels discussion. Defendant
> maintains that the lower court erred in finding that a confession given by him
> to the police was voluntarily made. At a <u>Walker</u> hearing conducted during
> trial, defendant testified that he was interrogated after a long period of time
> without sleep. He stated that he informed the interrogating officer, Sgt.
> Rossler, that he wanted an attorney and did not wish to make a statement, but
> that Sgt. Rossler (himself not a lawyer) advised him as an attorney to make
> one. Defendant claimed that he was specifically told that, if he confessed and
> agreed to testify against his accomplices, he would not be charged with first-
> degree murder.
>
> Sgt. Rossler, on the other hand, testified that he explained to defendant
> that if he was convicted of first degree murder the sentence was mandatory
> life. The sergeant admitted that a promise was made as an inducement for the

defendant's continued cooperation; however, he claimed that only his best efforts were at issue, and interpreted his promise as requiring only a favorable report to the trial court.[2] In admitting that he offered to speak to the judge and prosecutor about a lower sentence, Sgt. Rossler stated that he was referring to the possibility that defendant could be convicted of a lesser offense. Finally, the officer indicated that defendant had initially been informed of all his constitutional rights, and announced his desire to talk about the crime prior to any representations the sergeant might have given defendant.

After hearing all the testimony, the trial judge ruled that defendant's statements resulted from a voluntary exercise of will. On appeal, we do not reverse that finding unless, pursuant to a review of the totality of the circumstances, People v Robinson, 386 Mich 551, 557; 194 NW2d 709 (1972), People v Haner, 86 Mich App 280, 284; 272 NW2d 627 (1978), People v Cutler, 73 Mich App 313, 317; 251 NW2d 303 (1977), we are left with the definite and firm conviction that a mistake has been made. People v Smith, 80 Mich App 106, 111; 263 NW2d 306 (1977), People v Hummel, 19 Mich App 266; 172 NW2d 550 (1969). Following a review of the transcript, we are unable to reach such a determination, particularly where the trial judge was in a far better position to judge the credibility of the witnesses. People v Smith, supra at 268-270. Nor, in light of the conflicting testimony, can we find that the officer improperly represented himself as an attorney or denied defendant's Sixth Amendment right to counsel. We therefore leave intact the decision of the lower court.

[2]The officer stated [at the Walker hearing] that:

"A.     [SGT. ROSSLER] No. I told him I was not the judge. I told him that I would - - I could have made recommendations to the judge and that I had made recommendations in the past, just like a probation officer. They asked for reports, I give reports.

"Q.     [PROSECUTING ATTORNEY] You mean you weren't trying to indicate to him you would have an influence on the judge by that statement?

"A.     In fact, I told him that I wasn't the judge; that I wasn't a god; that what happens, happens, but I would try."

"Q.     You mean you told him you weren't a judge and I think he knew that."

"A.     Well, naturally.

32

"Q.      And obviously, I think he didn't refer to you as any kind of god either. But in a factly standpoint [sic], I mean Sergeant Rossler, are you telling us that you would speak to the judge on his behalf; that you weren't trying to indicate to him that you could have somebody go over - - about his sentencing?

A.      No. I don't believe I did. I told him that I done (sic) it in the past."

(Rule 5 Mat., *People v. Weiner*, No. 77-4885, 4-5 (Mich. Ct. App. Sept. 7, 1979).)

The Michigan Supreme Court denied Petitioner's application for leave to appeal in December 1986 (No. 79289).

### iii.   Discussion

The question on habeas review is whether the Michigan Court of Appeals' decision that Petitioner's confession was voluntary was "contrary to" or "an unreasonable application of" clearly established federal law as determined by the Supreme Court. *Williams*, 529 U.S. at 404-05. Stated differently, the writ cannot be granted unless the state court decision, evaluated objectively, resulted in an outcome that cannot reasonably be justified under Supreme Court precedent in existence at the time the conviction became final, which in this case occurred in 1986. *See Harris v. Stovall*, 212 F.3d 940, 943-45 (6th Cir. 2000) (the AEDPA expressly limits the source of law to cases decided by the United States Supreme Court prior to the time of the relevant state court decision).

Supreme Court precedent has long held that the Fourteenth Amendment to the Constitution requires the suppression of statements obtained by "techniques and methods offensive to due process." *Haynes v. Washington*, 373 U.S. 503, 515, 83 S. Ct. 1336, 10 L. Ed. 2d 513 (1963). To be admissible, a suspect's statement must be voluntary, and in

determining whether a statement was voluntary, the Court has held that the question is "whether the defendant's will was overborne at the time he confessed." *Id.* at 513.

In 1973, the Court explained that there is no "talismanic definition of 'voluntariness'" that is "mechanically applicable." *Schneckloth v. Bustamonte*, 412 U.S. 218, 224, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). Rather, the totality of all the surrounding circumstances must be assessed. *Id.* at 226. Those circumstances may include the failure of the police to advise the suspect of his rights, *Haynes*, 373 U.S. at 516-17, as well as any direct or implied promises of a benefit. *Brady v. United States*, 397 U.S. 742, 753, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970). Moreover, a court must take into account "both the characteristics of the accused and the details of the interrogation." *Schneckloth*, 412 U.S. at 226.

In this case, it is clear that the Michigan Court of Appeals applied the totality-of-the-circumstances approach when reviewing Petitioner's claim on appeal. The court noted that Petitioner claimed to have had no sleep, claimed to have asked for an attorney, claimed to have been promised that he wouldn't be charged with first-degree murder, and to have been promised that the police would make a favorable report to the court. The court also noted that Petitioner was informed of his constitutional rights, and thereafter announced his desire to talk with the police. These are all factors which the U.S. Supreme Court had, at that time, identified as relevant to the determination of voluntariness. The Michigan Court of Appeals further recognized that the trial court judge, who was in the best position to make a credibility determination, had found Petitioner's testimony unbelievable and found the officer's statements to be credible. The credibility of witnesses and whether in fact the police

34

engaged in coercive activity fall within the category of issues to which the presumption of correctness applies. *See* 28 U.S.C. § 2254(e)(1); *Miller v. Fenton*, 474 U.S. 104, 112, 106 S. Ct. 445, 88 L. Ed. 2d 405 (1985).

I suggest that Petitioner has not presented clear and convincing evidence to overcome the presumption. At the evidentiary hearing held by this Court, Petitioner presented nothing new with regard to this claim, but merely maintained that he was tricked, threatened and deceived into making his statement. (Evid. Hrng. Tr., Dkt. 41 at 19.) When asked to explain how, he stated that "the nature of the trickery was I was promised not to be charged with a murder one because I had a very difficult time understanding my role as a driver, being charged with murder one." (*Id.*) Moreover, this judicial officer found his testimony to not be credible, based upon the inconsistencies between his testimony at the *Walker* hearing and his current version of events. At the *Walker* hearing, as quoted *supra*, he testified that when he was taken to the interrogation room, he first met with Sergeant Ridling, who kept asking him to make a statement, and that after about 10 minutes Sergeant Rossler came in and, upon hearing that Petitioner was refusing to talk, advised him as an attorney to make a statement or he would be charged with "murder one." (*Id.* at 24-26.)

At the evidentiary hearing held by this Court, however, Petitioner testified as follows in response to questions from the bench:

> Q.   As I understand your testimony, your – the questioning process that led to the statement that I've heard about, in your estimation took about an hour; is that correct, sir?
>
> A.   I was in the – I was in the room approximately an hour.

Q.    Okay.

A.    Yes, sir.

Q.    Can you estimate, maybe in terms of a fraction, like a half, a third or a
      quarter, about how far into that period came the incidents that I've
      heard about concerning the request for a statement – why don't I leave
      the question there.

      About how far into that process do you recall the – the request that you
      make a statement, sir?

A.    Yes, Judge Binder. I do recall that and it was probably about, I'd say
      30 to 40 minutes into the conversation, because – and I think your
      record reflects in support of that, too.

Q.    All right. And then the later testimony that I've heard about concerning
      the incident where the sergeant said, well, I'm talking to you as an
      attorney, did that happen quite closely thereafter?

A.    Actually the way that I recall it, Judge Binder, is that Sergeant Rossler
      was in and out of the room, and when he came into the room at the –
      probably at the last of the – of this whole episode of trying to get the
      statement, he heard me say to Sergeant Riddling, well, I don't want to
      make a statement, I – I want an attorney. That's when he said, I'm
      speaking to you as an attorney. I think you should make a – a
      statement.

Q.    So those words were spoken by the sergeant rather late into this
      process?

A.    Yes.

(Evid. Hrng. Tr., Dkt. 41 at 29-31.) Clearly the two versions of events are not consistent.

Given that this Court's evidentiary hearing occurred twenty-six years after the events in

question, maybe that is not surprising. Nevertheless, having heard Petitioner's testimony

where he claims to have been tricked into confessing by the officer's promises and advice

as an attorney, as well as having heard from Sergeant Rossler that he never has presented

36

himself as an attorney to a suspect and that he did not tell Petitioner he was advising him as one (*id.* at 39), I, like the state trial judge, find Sergeant Rossler's testimony to be more credible.

Additionally, I note the existence of other factors worthy of recognition regarding the voluntariness of the confession, such as that Petitioner was in his late twenties, had completed two years of college, had been involved in two prior encounters with the criminal justice system, signed a constitutional rights form before making his statement, and signed the statement itself. Further, the evidence demonstrates that the interrogation was not excessively long, and there is no indication that Petitioner's personal characteristics, such as maturity or mental health, in any manner affected the freedom of his decision to confess.

Accordingly, I suggest that the Michigan Court of Appeals' holding that the admission of the statement complied with due process because the statement was voluntarily given – in other words, that Petitioner's will was not overborne by coercive threats or promises made by law enforcement officials – was not an objectively unreasonable application of then-existing Supreme Court precedent and does not entitle Petitioner to habeas relief.

**b.**      **The Claim that the Interrogation Should Have Immediately Stopped Pursuant to *Miranda* When Petitioner Requested Counsel**

The second issue incorporated into Petitioner's first habeas claim is that "when he invoked his *Miranda* rights, the officers were required to cease all communication with

Petitioner, and provide him with an attorney before further interrogation." (Br. in Supp. of Pet. at 36.)[7]

### i.    State Court History

This claim was first presented in June 1986 in Petitioner's motion for rehearing to the Michigan Court of Appeals, wherein he sought a rehearing of both prior decisions – the September 1979 decision overturning the conviction and the June 1986 decision reinstating the conviction.[8] The motion for rehearing was premised on two grounds. First, Petitioner's counsel argued that a recently-decided Michigan Supreme Court case, *People v Conte*, 421 Mich. 704 (1984), which held that under Art. I § 17 of the Michigan constitution, a statement induced by a police officer's promise of leniency was involuntary and inadmissible, mandated reversal. Second, it was argued that the U.S. Supreme Court had also decided a relevant case since the 1979 appeal, that of *Edwards v. Arizona*, 451 U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). Counsel pointed out that *Edwards* states that once an accused "expressed his desire to deal with the police only through counsel, [he] is not subject to

---

[7]Petitioner's sixth habeas claim, although worded slightly differently, is a duplicate of this claim, and therefore is also considered here. The sixth claim asserts that Petitioner's right to legal counsel during the interrogation process was violated and that his confession was improperly obtained when the interrogating officer, after being advised by Petitioner that he wanted an attorney, said he would talk to Petitioner as an attorney, and then proceeded to obtain a confession.

[8]I note that Petitioner's direct appeal brief did mention the *Miranda* case, but never presented the factual allegation that the failure to immediately cease interrogation when Petitioner asked for counsel constituted a violation. Instead, it argued that the confession should have been suppressed because Sergeant Rossler acted as defense counsel when he advised and induced Petitioner into making a statement. (Br. of Sept. 5, 1978, at 5-6.) The habeas exhaustion rule requires that the claim presented in state court be the "substantial equivalent" of that argued in the habeas case. *Picard v. Connor*, 404 U.S. 270, 278, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971). In other words, it must have been "'the same claim under the same theory.'" *Carver v. Straub*, 349 F.3d 340, 346 (6th Cir. 2003) (quoting *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987)). Here, although both the direct appeal brief and the habeas petition contain "unconstitutional admission of confession" arguments, they do not present the same claim under the same theory.

further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." *Id.* at 484-85. Counsel argued that the unrebutted testimony from the *Walker* hearing was that Petitioner requested counsel, but the police ignored the request and proceeded to interrogate Petitioner and induce him into making a statement through the use of promises of leniency and veiled threats of a mandatory life sentence. (Mot. for Reh'g dated June 23, 1986, at 3-4.) The motion for rehearing was summarily denied.

In August 1986, Petitioner filed an application for leave to appeal the denial of the motion for rehearing with the Michigan Supreme Court, again arguing that "the admission of the confession which was obtained after [Petitioner] had requested an attorney conflicts with the holding of . . . *Edwards*." (Dkt. 29, Br. dated August 21, 1986, at 8.) It was likewise denied. This issue was not raised in Petitioner's 1997 motion for relief from judgment or the subsequent appeals.

## ii.    Discussion

Counsel for Respondent argued in the response to Petitioner's summary judgment motion that this claim was procedurally barred.[9] (Dkt. 30 at 7.) In his reply brief, Petitioner countered that the trial court's *Walker* hearing was held to determine the "voluntariness of

---

[9]Counsel went on to alternatively argue that the Michigan Court of Appeals did address this issue when it stated, "nor can we find that the officer improperly represented himself as an attorney or denied defendant's Sixth Amendment right to counsel." (Dkt. 30 at 7, quoting Mich. Ct. of Appeals' 1979 op.) However, as Judge Lawson pointed out in the order granting an evidentiary hearing, this statement was not an adjudication of the issue because *Miranda*'s requirement that custodial interrogation cease at the moment a suspect requests counsel is rooted in the Fifth, not the Sixth, Amendment. (Dkt. 33 at 13.)

Petitioner's confession under *Miranda*," and that the "trial court did not procedurally default petitioner." (Dkt. 32 at 1.)

First, as a factual matter, this Court is unclear how counsel for Petitioner arrived at the conclusion that the *Walker* hearing dealt with the admissibility of the confession under *Miranda*. The transcript reveals that the entire hearing was focused on determining whether the officers compelled, coerced or tricked Petitioner into an involuntary confession. This is a separate legal issue grounded in the Due Process Clause of the Fourteenth Amendment, as previously discussed. *See Jackson v. Denno*, 378 U.S. 368, 376-77, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964) ("It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession."); *New Jersey v. Portash*, 440 U.S. 450, 459, 99 S. Ct. 1292, 59 L. Ed. 2d 501 (1979) ("[A] defendant's compelled statements, as opposed to statements taken in violation of *Miranda*, may not be put to any testimonial use whatever against him in a criminal trial.") Moreover, during the entire *Walker* hearing the word *Miranda* was never spoken, and the only time it was even alluded to was when the prosecutor verified the undisputed fact that Petitioner was read his constitutional rights and signed the form. The most telling fact, however, is that Petitioner never even mentioned on direct examination his allegation that he asked Sergeants Rossler and Ridling for an attorney. (Trial Tr. Vol. IV at 22-30.) It was not until he was being cross-examined by the prosecutor that he made this claim, and his attorney never followed up on

it, but continued to focus upon the issue of coercion. The Court must therefore address the issue of procedural bar, which was raised by Respondent.[10]

"It has been settled since *Ex parte Royall*, 117 U.S. 241, 6 S. Ct. 734, 29 L. Ed. 868 (1886), that a state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971). When a habeas petitioner has (1) failed to fairly present a claim to the state courts, and (2) the state rules forbid him from returning to the state courts to present his claim, then the claim is technically exhausted but procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 161, 116 S. Ct. 2074, 135 L. Ed. 2d 457 (1996) (explaining that the state rule which forbids the return to state courts provides the adequate and independent state-law ground for the conviction which prevents habeas review in the absence of cause and prejudice); *Gall v. Parker*, 231 F.3d 265, 283-84 (6th Cir. 2000); *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

The first question, then, is whether this claim was fairly presented to the state courts, considering that the only time it was ever argued to the Michigan Court of Appeals was in a motion for rehearing. Raising a claim for the first time in a motion for rehearing to the Michigan Court of Appeals does not meet the habeas standard:

> A claim is not fully and fairly presented to the state courts if its merits will not be considered unless there are special reasons for review. *See Castille v. Peoples*, 489 U.S. 346, 349 (1989). The Michigan Court of Appeals limits its review to issues identified in the "statement of issues presented." *See Joerger*

---

[10]This argument, although raised in response to a motion that was dismissed, is still pending because the motion was found moot in anticipation of the argument being addressed at the evidentiary hearing and in this Report and Recommendation.

41

*v. Gordon Food Serv., Inc.*, 568 N.W.2d 365, 368 (Mich. App. 1997). Matters first raised on a motion for rehearing are not included in the statement of issues presented. *See Metro Homes, Inc. v. City of Warren*, 173 N.W.2d 230, 233 (Mich. App. 1969); *Cruz v. Warden*, 907 F.2d 665, 669 (7th Cir. 1990).

*Paredes v. Johnson*, No. 98-2313, 2000 WL 1206544, at **1 (6th Cir. Aug. 18, 2000) (unpublished). *See also Rouse v. Phillips*, No. 01-CV-72688-DT, 2002 WL 484646, at *1 (E.D. Mich. March 18, 2002) (unpublished) ("Raising issues in a petition for rehearing on appeal, however, does not constitute exhaustion of state remedies.").

Second, at the time this habeas petition was filed, Petitioner had no avenue for returning to the state courts and presenting this or any other claim, because he had already filed a motion for relief from judgment in 1997, and only one such motion is allowed per conviction after August 1, 1995. MICH. CT. RULE 6.502(G)(1). This rule is an adequate and independent state ground that is appropriately applied here because Petitioner was on notice of this firmly established rule when he filed his motion for relief from judgment in 1997 and yet failed to include this issue. *See Luberda v. Trippett*, 211 F.3d 1004, 1006-07 (6th Cir. 2000). Thus, this claim is technically exhausted, yet it is procedurally defaulted and may not be reviewed absent showing of cause for the failure to fairly present the claim and actual prejudice from the alleged error. *Gray*, 518 U.S. at 161-62; *Rust*, 17 F.3d at 160.

Petitioner does not attempt to show cause for the procedural default, but rather maintains that the *Walker* hearing addressed the *Miranda* claim and therefore the "trial court did not procedurally default Petitioner." (Dkt. 32 at 1.) As previously stated, I find this argument to be without merit because the *Walker* hearing clearly did not address the issue

42

of whether the officers failed to stop the interrogation upon a request for counsel in violation of *Miranda*.

On the question of prejudice, which was likewise not addressed by Petitioner, I suggest that Petitioner was not prejudiced by the failure to raise the claim. The trial court heard testimony from both parties at the *Walker* hearing, including Petitioner's statement on cross-examination that he asked for an attorney and never got one, and the court expressly found Petitioner's testimony to be untruthful. (Trial Tr. IV at 47-48.) In fact, the court specifically stated that Petitioner's story "just doesn't ring true at all." (*Id.* at 47.) One part of Petitioner's "story," at least on cross-examination, was that he asked for a lawyer and didn't get one. Therefore, it logically follows that the trial court made a factual finding, which is entitled to deference by this Court, that Petitioner did not make a request for counsel. The Michigan Court of Appeals relied upon the trial court's credibility findings, as should this Court. Accordingly, I suggest that, even if Petitioner's counsel had followed up on Plaintiff's statement, raised the issue of the failure to stop the interrogation, and elicited testimony from Sergeant Rossler (who testified at this Court's evidentiary hearing that Petitioner did not ask for counsel and that, if he had, the interrogation would have immediately stopped and Petitioner would have been returned to a cell until counsel was provided), it is a virtual certainty that the court would not have found in Petitioner's favor, but would have held that Petitioner did not invoke his right to counsel and that no *Miranda* or Fifth Amendment violation occurred.

Furthermore, even if defense counsel had been successful in getting Petitioner's statement suppressed, it still cannot be said that Petitioner was prejudiced, where two accomplices testified against him regarding his participation in the planning and commission of the crime. This was not a case where the only evidence tying Petitioner to the robbery was his own statement. The first-hand accounts from White and LaForest were detailed and substantially consistent. Additionally, White testified that the entire chain of events was driven by the fact that Petitioner needed the money for his van payments within a few days. (Trial Tr. Vol. IV at 113.) It is asking too much to draw the inference that the jury would not have believed any of White's and LaForest's account of events if they had not also heard Petitioner's inculpatory statement.

When a petitioner has failed to demonstrate cause or prejudice, the claim is barred from review unless he can show that a miscarriage of justice would result from failure to address the merits of the claim. The miscarriage of justice exception applies when a constitutional violation probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 324, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995); *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986). To demonstrate a fundamental miscarriage of justice, a petitioner must "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324. In this case, Petitioner has not presented new

44

reliable evidence to support a claim of actual innocence, and I therefore suggest that,
pursuant to the doctrine of procedural default, this claim is foreclosed from habeas review.

## 3.     Petitioner's Second Habeas Claim: Insufficient Evidence

Petitioner's next claim is that his constitutional right to a fair trial was violated when
the state failed to provide the jury with sufficient evidence for them to find him guilty of
first-degree murder, thereby requiring a directed verdict of acquittal.

The Court found that Respondent forfeited the right to answer this claim, as well as
all subsequent claims to be addressed in this Report and Recommendation. (Dkt. 18.)

This claim was first raised in Petitioner's motion for relief from judgment filed in
1997. The trial court denied the motion, finding that Petitioner had procedurally defaulted
the claim, and that he had not shown "good cause for failure to raise such grounds on appeal"
and "prejudice from the alleged irregularities that support the claim for relief" as required
by Michigan Court Rule 6.508(D)(3).[11] (Rule 5 Mat., *People v. Weiner*, No. 77-03866

---

[11]That court rule states:

> The defendant has the burden of establishing entitlement to the relief requested. The court
> may not grant relief to the defendant if the motion
>
>> (3) alleges grounds for relief, other than jurisdictional defects, which could have
>> been raised on appeal from the conviction and sentence or in a prior motion under
>> this subchapter, unless the defendant demonstrates
>>
>>> (a) good cause for failure to raise such grounds on appeal or in the prior
>>> motion, and
>>>
>>> (b) actual prejudice from the alleged irregularities that support the claim for
>>> relief. As used in this subrule, "actual prejudice" means that,
>>>
>>>> (i) in a conviction following a trial, but for the alleged error, the
>>>> defendant would have had a reasonably likely chance of acquittal;
>>>>
>>>> . . . .
>>>>
>>>> (iii) in any case, the irregularity was so offensive to the
>>>> maintenance of a sound judicial process that the conviction should
>>>> not be allowed to stand regardless of its effect on the outcome of
>>>> the case;
>>>>
>>>> . . . .

45

(Detroit Recorder's Ct., August 22, 1997).) The Michigan Court of Appeals denied leave to appeal "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)," (Rule 5 Mat., *People v. Weiner*, No. 213809 (Mich. Ct. App. Dec. 11, 1998)), and the Michigan Supreme Court likewise denied leave to appeal using the identical language as the appellate court. (Rule 5 Mat., *People v. Weiner*, No. 113960 (Mich. Aug. 31, 1999).)

As applied to a petition for the writ of habeas corpus, the doctrine of procedural default provides that

> [i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991).

The Sixth Circuit has set forth a four-part test for determining whether a petitioner's claim is procedurally defaulted and therefore barred from habeas review. *See Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986); *Cooey v. Coyle*, 289 F.3d 882, 897 (6th Cir. 2002). First, the federal habeas court must determine whether there is a state procedural rule that is applicable to the petitioner's claim and whether the petitioner failed to comply with that rule. *Maupin*, 785 F.2d at 138. Second, the court must determine whether the procedural sanction

---

> The court may waive the "good cause" requirement of subrule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime.

MICH. CT. RULE 6.508(D).

was actually enforced by the state courts – that is, whether the state courts actually based their decisions on the procedural rule. *Id.*

In this case, these two prongs of the four-pronged *Maupin* test are satisfied. First, under Michigan law, a defendant who raises new claims in a motion for relief from judgment must demonstrate "good cause" for failure to have raised the grounds for relief on appeal and "actual prejudice" therefrom. MICH. CT. RULE 6.508(D)(3)(a)-(b). Second, we know that the state courts actually based their decisions on this rule, because the trial court stated that Petitioner had not shown "good cause for failure to raise such grounds on appeal," and both appellate courts denied Petitioner's motions for leave to appeal by explicitly holding that Petitioner had failed to establish entitlement to relief under Rule 6.508(D).

Third, the federal court must consider whether the procedural rule is an adequate and independent state ground on which the state can rely to foreclose federal review of a federal constitutional claim. *Maupin*, 785 F.2d at 138. The Supreme Court has held that "only a 'firmly established and regularly followed state practice' may be interposed by a State" to preclude subsequent federal habeas review. *Ford v. Georgia*, 498 U.S. 411, 423-24, 111 S. Ct. 850, 112 L. Ed. 2d 935 (1991) (citations omitted). In this case, Michigan Court Rule 6.508(D)(3), was not enacted until 1989, three years after Petitioner's conviction became final. In *Rogers v. Howes*, 144 F.3d 990 (6th Cir. 1998), a habeas case filed by a Michigan prisoner who was convicted approximately 25 years before the enactment of MCR 6.508, the court stated that the rule should only be considered "firmly established" if it was effective "when petitioner had a right to a direct appeal." *Rogers*, 144 F.3d at 992. Here, where the

47

rule was not effective until three years after the conclusion of Petitioner's direct appeal, the state court's finding of procedural default does not preclude habeas review. However, since there is no state court opinion to review, this Court is to determine whether the state court's inaction produced a result which is contrary to clearly established Supreme Court precedent. *Bugh v. Mitchell*, 329 F.3d 496, 508 (6th Cir. 2003).

When a habeas petitioner raises a claim that the evidence upon which he was convicted was insufficient, the United States Supreme Court case of *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed.2d 560 (1979), provides the applicable federal law. In *Jackson*, the Court held that the U.S. Constitution prohibits criminal convictions except upon proof of guilt beyond a reasonable doubt. *Id.* at 309 (citing *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)). A reviewing court need not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (citing *Woodby v. INS*, 385 U.S. 276, 282, 87 S. Ct. 483, 17 L. Ed. 2d 362 (1966)). Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

In this case, Petitioner claims that the prosecution did not present sufficient evidence to prove the element of intent. (Br. in Supp. of Pet. at 42.) Petitioner makes the following arguments in support of his claim: he claims the testimony showed that he had minimal participation in the planning of what was to be nothing more than a simple robbery; he never went to the scene of the crime; the resistance and struggle put up by the victim of the robbery

was unexpected; not even the shooter had the intent, before the crime occurred, to shoot the victim; Petitioner had repeatedly told everyone involved that he did not want anyone hurt; he had no gun while he was waiting in the van during the commission of the crime; all five participants truly believed that once the victim's attention was diverted to the floor to help White pick up the contents of her purse, Candy Man and Wilson would be able to quickly secure the victim; and therefore Petitioner had a "reasonable expectation to believe no one would be hurt for any reason." (Br. in Supp. of Pet. at 40-41.)

The first step in determining whether sufficient evidence was presented so that a rational jury could have found the essential elements of the crime beyond a reasonable doubt is to set forth the elements of the offense under the state law as it existed at the time of the trial. In this case, where Petitioner confines his argument to the element of intent necessary for a felony murder conviction, a review of felony murder under Michigan law as of August 1977 is required. The state of the law at that time was summarized by Judge Tarnow in a 1998 habeas opinion stemming from a 1975 Michigan felony murder conviction:

At the time of the commission of this offense, Michigan still followed the old common law felony-murder rule. Michigan's first degree murder statute, M.C.L.A. § 750.316; M.S.A. § 28.548, as enacted at the time of this offense, indicated that a murder which was committed during the course of certain enumerated felonies, including robbery, was first degree murder. Under the felony-murder doctrine in place at the time of petitioner's trial, all parties to an agreement to commit one of the felonies enumerated in the murder statute were liable for a murder committed in furtherance of that planned felony, even though a homicide was not planned. *People v. Smith*, 33 Mich. App. 336, 189 N.W.2d 833 (1971); *See also People v. Goree*, 30 Mich. App. 490, 186 N.W.2d 872 (1971).

In *People v. Aaron*, 409 Mich. 672, 299 N.W.2d 304 (1980), the Michigan Supreme Court abolished the felony-murder doctrine, holding that the intent

49

> to commit a felony does not equal the requisite malice aforethought element of murder. The Supreme Court ruled that, to obtain a conviction for first degree felony murder, the state would now have to show, in addition to the commission of the felony, that the defendant had acted with malice aforethought, i.e., an intent to kill, an intent to do great bodily harm, or a wanton and wilful disregard that the natural tendency of one's behavior is to cause death or great bodily harm. *People v. Aaron, supra.*
>
> The decision in *People v. Aaron, supra,* however, was not applied retroactively. The holding only applied prospectively to any trials in progress or future trials occurring after the November 24, 1980, decision of the Court. *People v. Aaron, supra* at 734, 299 N.W.2d 304; *Bowen v. Foltz,* 763 F.2d 191, 192 (6th Cir. 1985); *People v. Smith,* 108 Mich. App. 338, 342, 310 N.W.2d 235 (1981).
>
> Petitioner does not contest his involvement in the robbery, but denies being the shooter. Under the old felony-murder rule in effect at the time of petitioner's trial, petitioner's involvement in this robbery renders him liable for this murder. *People v. Smith, supra.*

*Harris v. Stovall,* 22 F. Supp. 2d 659, 666-67 (E.D. Mich. 1998).

In Michigan at the time of Petitioner's trial, a felony murder conviction only required that the defendant possessed the intent to commit the underlying felony, in this case a robbery. Petitioner here, like the petitioner in *Harris,* has acknowledged that he had the intent to commit a robbery when he participated in its planning, drove the other participants to the scene of the crime, and waited for them to return to the vehicle. I suggest therefore that the evidence presented was sufficient. It was not necessary under the law in effect at that time for the prosecutor to demonstrate that Petitioner had an intent to kill.

Furthermore, I suggest that, even if the post-*Aaron* law is applied to Petitioner, the evidence could have led a rational jury to conclude that he possessed the requisite "malice aforethought," or intent. The *Aaron* court stated that